FILED
2022 Aug-03  AM 08:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MICHAEL E. WEEMS,** | } | |
| | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:21-cv-00617-MHH** |
| | } | |
| | } | |
| **SOCIAL SECURITY** | } | |
| **ADMINISTRATION,** | } | |
| **COMMISSIONER,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Michael Weems seeks judicial review of a final adverse decision of the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). The Commissioner denied Mr. Weems's applications for disability insurance benefits and supplemental security income based on an Administrative Law Judge's finding that Mr. Weems was not disabled.   Mr. Weems argues that the Administrative Law Judge did not properly evaluate the credibility of his description of his pain under the Eleventh Circuit pain standard and that the ALJ did not properly articulate good cause for according less weight to the opinion of Mr. Weems's

treating physician.  After careful review of the administrative record, for the reasons discussed below, the Court remands this matter to the Commissioner for further proceedings.

## LEGAL STANDARD FOR DISABILITY AND SSI

To succeed in his administrative proceedings, Mr. Weems had to prove that he was disabled.  *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013).  "A claimant is disabled if he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." *Gaskin,* 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)).[1]

To determine whether a claimant has proven that he is disabled, an ALJ follows a five-step sequential evaluation process.  The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the

---

[1]  Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program.  Title XVI of the Act governs applications for Supplemental Security Income or SSI.  "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited July 26, 2022).

claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

"The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

## ADMINISTRATIVE PROCEEDINGS

In 2019, Mr. Weems applied for supplemental security income and for disability insurance benefits. (Doc. 11-6, pp. 18, 26). Mr. Weems alleged that his disability began on October 1, 2018. (Doc. 11-6, pp. 12, 26). The Commissioner initially denied Mr. Weems's claim on September 20, 2019. (Doc. 11-5, p. 12). Mr. Weems requested a hearing before an ALJ. (Doc. 11-5, p. 21). Mr. Weems's hearing was held via telephone on November 24, 2020. (Doc. 11-3, p. 35). The ALJ issued an unfavorable decision on December 15, 2020. (Doc. 11-3, p. 16). On April 15, 2021, the Appeals Council denied Mr. Weems's request for review (Doc. 11-3, p. 2), making the Commissioner's decision final and a proper candidate for this Court's judicial review. *See* 42 U.S.C. § 405(g) and § 1383(c).

## EVIDENCE IN THE ADMINISTRATIVE RECORD

### *Mr. Weems's Medical Records*

To support his applications, Mr. Weems submitted medical records dating to 2007. Mr. Weems's medical records relate to the diagnoses and treatment of degenerative joint disease in his knees and cervical spine, obesity, hypertension, hyperlipidemia, GERD, and hyperthyroidism. The Court has reviewed Mr. Weems's complete medical history and briefly summarizes the following medical records because they are the most relevant to Mr. Weems's arguments in this appeal.

Mr. Weems visited Dr. David Aarons on August 23, 2011. (Doc. 11-8, p. 10). Mr. Weems complained of low back pain and right-hand weakness. (Doc. 11-8, p. 10). Mr. Weems, who was 38 years old, explained that he had injured his back at work when he was in his early 20s. (Doc. 11-8, p. 10). He rated his back pain 7 of 10. (Doc. 11-8, p. 11). Mr. Weems reported that he could walk about one hundred feet, stand for less than fifteen minutes, and sit for less than an hour. (Doc. 11-8, p. 10). Regarding his daily activities, Mr. Weems reported that he was able to drive, bathe, dress, and feed himself. (Doc. 11-8, p. 10). Mr. Weems reported that "he last worked in 2009 as a forklift operator but he lost that job due to his right-hand weakness." (Doc. 11-8, p. 11).

Dr. Aarons examined Mr. Weems and noted that Mr. Weems could walk without assistance and sit comfortably for short periods. Mr. Weems got on and off

the exam table with a little difficulty; he was able to "take his shoes off and put them back on." (Doc. 11-8, p. 11). Dr. Aarons diagnosed Mr. Weems with degenerative disc disease of the lumbar spine with right leg radiculopathy. (Doc. 11-8, p. 13). Dr. Aarons also indicated that Mr. Weems had "either carpal tunnel syndrome or maybe an impingement of nerves in the cervical spine that [was] causing his right-hand weakness and mild atrophy." (Doc. 11-8, p. 13). His right-hand strength was 4 of 5. (Doc. 11-8, p. 10).

Mr. Weems sought treatment at Alabama Orthopedic Surgeons on February 2, 2017. (Doc. 11-8, p. 147). Mr. Weems complained that he had experienced left arm pain and numbness for two weeks. (Doc. 11-8, p. 147). Mr. Weems reported that he had not injured his arm, but he explained that in August of 2016, he heard a popping in his shoulder while he was at work. (Doc. 11-8, p. 147). Dr. Hodges ordered an MRI and compared it to a 2016 MRI in Mr. Weems's records. Dr. Hodges noted that the 2017 MRI "show[ed] evidence of some degenerative change with only C5-6 and C6-7 with some associated stenosis." (Doc. 11-8, p. 148). Dr. Hodges explained that "[a]lthough the radiologist state[d] there [was] mild foraminal narrowing there certainly appear[ed] to be some pretty significant foraminal narrowing more so at C6-7 on the left at C5-6." (Doc. 11-8, p. 148). Dr. Hodges noted that Mr. Weems reported that his neck pain increased with range of motion of the cervical spine, but there was no evidence of increased pain with range of motion

of the lumbar spine or arms.  (Doc. 11-8, p. 148).  Dr. Hodges indicated that Mr. Weems had no paraspinal muscle spasms, and he had five out of five strength in his arms.  (Doc. 11-8, p. 148).

Dr. Hodges opined that Mr. Weems's symptoms were related to a pinched nerve in his neck.  Dr. Hodges noted that "[Mr. Weems] was quite miserable."  (Doc. 11-8, p. 149).  Mr. Weems received an injection for pain, and Dr. Hodges explained that "ultimately [Mr. Weems] may need to repeat an MRI scan and consider surgical intervention."  (Doc. 11-8, p. 149).  Dr. Hodges diagnosed Mr. Weems with spinal stenosis in the cervical region and prescribed Norco, gabapentin, and Medrol.  (Doc. 11-8, pp. 148-49).

When Mr. Weems returned to Alabama Orthopedic on September 6, 2018, he received treatment from Dr. Cobb.  (Doc. 11-8, p. 158).  Dr. Cobb noted that Mr. Weems was referred by his primary care physician and another orthopedic surgeon, and his chief complaint was bilateral knee pain that he had experienced for years. (Doc, 11-8, p. 158).  Mr. Weems was having more trouble with his left knee than his right.  (Doc. 11-8, p. 158).  He reported that his knee pain impacted his ability to walk.  He explained that he could walk one block using a cane.  (Doc. 11-8, p. 158).  Mr. Weems reported that he had tried physical therapy for six months and that he took anti-inflammatory medications and narcotic pain relievers with no relief.  (Doc. 11-8, p. 158).

An x-ray revealed severe "tricompartmental osteoarthritis with a genu varum deformities." (Doc, 11-8, p. 158).[2] Dr. Cobb wrote that Mr. Weems had "failed all conservative treatment and I discussed with him his options[.]  I do not feel that arthroscopy is a viable option for him[;] therefore[,] I feel that he is a good candidate for a left total knee arthroplasty." (Doc. 11-8, p. 158).

Mr. Weems visited St. Vincent's East on September 19, 2018, for a total left knee arthroplasty. (Doc. 11-8, pp. 15, 161). Mr. Weems received in-patient care, antibiotics, pain medication, and physical therapy until September 21, 2018.  At discharge, Mr. Weems was instructed to follow up with Dr. Cobb. (Doc. 11-8, p. 15).

On October 4, 2018, Mr. Weems had a follow-up appointment with Dr. Cobb. (Doc. 11-8, p. 162).  Dr. Cobb noted that a two-way x-ray revealed that Mr. Weems's left knee was excellently aligned with the prosthesis and that there was no evidence of loosening.  (Doc. 11-8, p. 162).  Dr Cobb instructed Mr. Weems to participate in outpatient physical therapy, and he refilled Mr. Weems's prescriptions for Norco, Naproxen, and Gabapentin.  (Doc. 11-8, p. 162).  Mr. Weems returned on October 25, 2018 for a follow-up visit.  (Doc. 11-8, p. 164).  Dr. Cobb noted that there was

---

[2] "Varus knee, also known as genu varum, is a condition that affects the alignment of bones in a person's leg. . . .  [T]he larger bone in [the] calf, the tibia, is misaligned with the large bone in your thigh, the femur."   https://www.webmd.com/a-to-z-guides/best-exercises-varus-knee#:~:text=Varus%20knee%2C%20also%20known%20as,knee%20is%20common%20in%20newborns. (last visited June 27, 2022).

no evidence of instability and that Mr. Weems was neurovascularly intact in the left lower extremity. (Doc. 11-8, p. 165). Mr. Weems had returned to work, but Dr. Cobb recommended that Mr. Weems not work because of "his inability to stand . . . for long periods of time or ambulate to the proficiency of being able to preform [*sic*] in a [*sic*] affective manor [*sic*]." (Doc. 11-8, p. 165).

Mr. Weems saw Dr. Cobb again on November 15, 2018. (Doc. 11-8, p. 166). Mr. Weems reported that as he was sitting on his bed putting on a shoe, he heard a pop in his knee. (Doc. 11-8, p. 166). Again, Dr. Cobb recommended that Mr. Weems not work until his next visit. (Doc. 11-8, p. 166). Dr. Cobb refilled Mr. Weems's prescriptions for pain relievers. (Doc. 11-8, p. 166).

Mr. Weems returned three weeks later. (Doc. 11-8, p. 168). He complained of pain after feeling three pops in his knee. (Doc. 11-8, p. 168). Dr. Cobb noted that Mr. Weems did not demonstrate evidence of loosening in the coronal or sagittal planes. (Doc. 11-8, p. 168). Because Mr. Weems continued to have difficulty and instability, Dr. Cobb recommended a "revision left total knee arthroplasty." (Doc. 11-8, pp. 168, 169).

Mr. Weems was admitted to St. Vincent's East on January 9, 2019 for mechanical instability and loosening in his left knee replacement. (Doc. 11-8, p. 97). Following surgery, Mr. Weems was treated with pain medication and physical therapy. Mr. Weems was discharged two days later with no complications. (Doc.

11-8, p. 97).  At discharge, Mr. Weems was instructed to follow up with Dr. Cobb. (Doc. 11-8, p. 97).

Mr. Weems returned to Dr. Cobb for a post-operative follow-up on January 29, 2019.  (Doc. 11-8, p. 172).  Dr. Cobb noted that Mr. Weems appeared to be doing well, and he recommended that Mr. Weems move to outpatient physical therapy. (Doc. 11-8, p. 172).  Dr. Cobb asked that Mr. Weems not work for three months as he healed and until he could be reevaluated.  (Doc. 11-8, p. 172).

Mr. Weems had a follow-up visit with Dr. Cobb on February 12, 2019. (Doc. 11-8, p. 150).  Mr. Weems's chief complaint was pain in his left knee. (Doc. 11-8, p. 150).   Dr. Cobb reported that although Mr. Weems was improving, he was not able to work because his job was "very physically demanding," and Mr. Weems could not stand walk for the duration of his shift.  (Doc. 11-8, p. 150).  Dr. Cobb indicated that Mr. Weems had a good range of motion with no evidence of instability, but he recommended that Mr. Weems stay off work for two months and continue therapeutic exercises.  (Doc. 11-8, p. 150).  Dr. Cobb refilled Mr. Weems's pain medication prescriptions and gave him an antibiotic as a prophylactic because Mr. Weems had some redness around his incision.  (Doc. 11-8, p. 150).

On April 16, 2019, Mr. Weems returned to Dr. Cobb's office complaining that his knee was painful.  (Doc. 11-8, p. 154).   Mr. Weems reported some micro instability in his knee, and he reported that he had been terminated from his job.  Dr.

Cobb noted that Mr. Weems used a cane to walk, and he gave Mr. Weems a prescription for pain medication and a handicap placard. (Doc, 11-8, p. 154). Dr. Cobb noted that Mr. Weems had done well in physical therapy; he recommended that Mr. Weems continue his exercises. (Doc, 11-8, p. 150). Mr. Weems's physical exam revealed no instability, and his x-ray "demonstrate[d] good overall alignment with no evidence of loosening of the femoral or tibial components." (Doc. 11-8, p. 151).

On March 10, 2020, Mr. Weems visited Dr. Ashley Walker at Christ Health Center for a prescription refill and follow-up. (Doc. 11-9, p. 15). Dr. Ashley noted that Mr. Weems had not been to the clinic in about 18 months and that he had not seen Dr. Cobb since August of 2019. (Doc. 11-9, p. 19). Dr. Walker noted that Mr. Weems "continue[d] to have pain in his left knee. He also ha[d] worsening pain in his right knee due to gait abnormality." (Doc. 11-9, p. 19). After a physical exam, Dr. Walker noted that Mr. Weems had a click in his left knee with movement and pain with valgus and varus stress. Dr. Walker noted no swelling and normal motor strength. (Doc. 11-9, p. 20). Mr. Weems was not using pain medication for his knee. (Doc. 11-9, p. 21). Mr. Weems asked for "a letter for disability to state that he can not work due to left knee replacement." (Doc. 11-9, p. 17). Dr. Walker advised Mr. Weems that he needed to see a disability doctor for a formal evaluation. (Doc. 11-9, p. 21).

On April 7, 2020, Mr. Weems visited Dr. Moore, an orthopedist. (Doc. 11-9, p. 7). Dr. Moore reported that Mr. Weems had severe primary arthritis in both knees and that he could barely stand or walk. (Doc. 11-9, pp. 7, 9). Dr. Moore opined that Mr. Weems likely needed a revision of his left knee replacement and a total right knee replacement. (Doc. 11-9, p. 7). Dr. Moore indicated that Mr. Weems reported that he had completed physical therapy with no improvement. (Doc. 11-9, p. 7). On a "Physical Capacities Checklist," Dr. Moore opined that in an eight-hour workday, Mr. Weems could sit for two hours at a time and stand and walk for zero hours at a time. (Doc. 11-9, p. 8). Dr. Moore indicated that Mr. Weems could occasionally lift, carry, or push and pull eleven to twenty pounds, and Mr. Weems could not do repetitive movements with his feet or legs, but he could do those motions with his arms and hands. (Doc. 11-9, p. 8). Dr. Moore concluded that Mr. Weems could not climb stairs or ladders, balance, stoop, bend, kneel, crouch, squat, or crawl, but he could occasionally reach forward or overhead and occasionally handle and finger. (Doc. 11-9, p. 8).

Due to the COVID19 pandemic, Mr. Weems had a telehealth appointment with Dr. Hodge on April 17, 2020 for a medication follow-up and refill. (Doc. 11-9, pp. 15-17). Because Mr. Weems could not visit Dr. Hodge in person, Dr. Hodge was not able to record Mr. Weems's vital signs or measure his motor strength. (Doc. 11-9, p. 15). Mr. Weems reported that he was doing well on the medications to treat

his hypertension and hyperlipidemia.  (Doc. 11-9, p. 17).  Mr. Weems reported that he was taking his blood pressure at home, eating one meal per day with sugary drinks, and not losing much weight because he could not exercise because of his knee pain.  (Doc. 11-9, p. 17).  Dr. Hodge noted that she and Mr. Weems discussed his diet extensively; she asked Mr. Weems to cut out sugar, drink only water, and monitor his weight.  (Doc. 11-9, p. 17).  Dr. Hodge asked Mr. Weems to continue his medication and to take ibuprofen to relieve his pain.  Dr. Hodge noted that Mr. Weems could "reach[] out to [Dr. Cobb] for further evaluation of [his] continued knee pain."  (Doc. 11-9, p. 17).

Because of Covid, Mr. Weems had a Telemed appointment with Dr. Moore in May of 2020.  (Doc. 11-9, pp. 32-33).  Mr. Weems complained of left knee pain.  (Doc. 11-9, p. 32).  Dr. Moore noted that Mr. Weems had had chronic knee pain since 2018 and that Mr. Weems's 2018 x-ray of his left knee showed "bone on bone."  (Doc. 11-9, pp. 32-33).  Dr. Moore added that Mr. Weems had revision surgery because he had complications, but the revision did not seem to resolve the issues because Mr. Weems reported instability and popping when he flexed his knee.  (Doc. 11-9, p. 32).  Dr. Moore noted that for the pain in his left knee, Mr. Weems would be referred to Dr. Cowley, explaining:

> [h]e has no insurance and cannot afford another visit. He would like a second opinion of his left knee replacement and consultation for replacement of the right knee.  He has done PT, anti-inflammatories PRN, and injections in the past but his pain is unbearable with walking

and his left knee feels unstable, XR from his old orthopedist's office showed bone on bone years ago.

(Doc. 11-9, p. 33).

*Administrative Assessment by Dr. Sellman*

Dr. Gloria Sellman conducted a disability determination assessment on Mr. Weems on August 28, 2019.  (Doc. 11-4, pp. 4-14).  Dr. Sellman summarized Mr. Weems's visits with Alabama Orthopedic Surgeons and his activities of daily living.  (Doc. 11-4, pp. 6-9).  Regarding his daily activities, Dr. Sellman indicated that Mr. Weems could not put on socks and shoes, cook, or complete chores, but Mr. Weems could drive, shop, handle money, watch tv, work, and visit family.  (Doc. 11-4, p. 8-9).

Dr. Sellman indicated that Mr. Weems had the impairments of osteoarthrosis and allied disorders, essential hypertension, sleep-related breathing disorders, and other disorders of the gastrointestinal system.  (Doc. 11-4, p. 10).  Dr. Sellman noted that Mr. Weems's osteoarthrosis and gastrointestinal system disorders were severe, and his essential hypertension and sleep-related breathing disorders were non-severe.  (Doc. 11-4, p. 10).  Dr. Sellman concluded that one or more of Mr. Weems's medically-determinable impairments could reasonably be expected to produce the pain or other symptoms that Mr. Weems reported.  (Doc. 11-4, p. 10).  Dr. Sellman opined that Mr. Weems could pull ten pounds and stand and walk with normal breaks for a total of six hours in an 8-hour workday.  (Doc. 11-4, p. 11).  Dr. Sellman

concluded that Mr. Weems had limited pushing, pulling, postural, and environmental exposure abilities, noting that Mr. Weems could frequently climb ramps and stairs and balance; he could never climb ladders, ropes, or scaffolds; and he could occasionally stoop, kneel, crouch, and crawl.  Dr. Sellman noted that Mr. Weems had no manipulative, visual, or communicative limitations, but he should avoid concentrated exposure to the environment.  (Doc. 11-4, p. 11).

Citing to two of Mr. Weems's appointments with Dr. Cobb, (s*ee* Doc. 11-8, pp. 150, 154), Dr. Sellman concluded that Mr. Weems's statements about the intensity, persistence and functionally limiting effects of his symptoms were partially consistent with the medical evidence in his file.  (Doc. 11-4, p. 12).

> Underwent explant of the left total knee arthroplasty, revision left total knee arthroplasty and complete synovectomy. ADLS noted limitations on lifting, squatting, and bending. 2/12/19 f/u time reveals patient has good overall range of motion with no evidence at this time of instability. Skin exam   reveals previous erythema but no fluctuance or induration. 4/16/2019 c/o left knee pain, Physical Exam: Physical exam at this time reveals patients mid-line incision is healing nicely. Patient is neurovascularly intact in the left lower extremity. Skin exam reveals no lesions. Patient goes through flexion and extension at this time and there is some crepitus noted around the area of the lateral retinaculum however no instability to varus valgus stretching at 0 and 30 degrees. No evidence of anterior draw or instability. 2 view xray of the left knee demonstrates good overall alignment with no evidence of loosening of the femoral or tibial components. PT records were requested  but  not received. He reported that he drives, can handle money, and visit family. clmt's MDIs could reasonably expected to produce some of the above stated symptoms and limitations. The severity alleged is not consistent with the evidence in file. Clmt's statements are considered partially consistent.

(Doc. 11-4, p. 12).

Dr. Sellman conducted a residual functional capacity assessment pointing to several of Mr. Weems's medical records from 2017-2019 as support for her findings. (Doc. 11-4, pp. 12-13).  Dr. Sellman concluded that Mr. Weems could occasionally lift or carry twenty pounds. (Doc. 11-4, p. 12).  And Mr. Weems should avoid concentrated exposure to extreme heat, vibration, fumes, odors, dust, gases, and poor ventilation, and he should avoid unprotected heights and hazardous moving machinery.  (Doc. 11-4, p. 13).

*Administrative Hearing*

Mr. Weems's administrative hearing took place on November 24, 2020.  (Doc. 11-3, p. 35).  Mr. Weems testified that he lived with his father, his sister, and his sister's boyfriend.  (Doc. 11-3, p. 41).  Mr. Weems testified that he had an eighth-grade education, but he had obtained his GED.  (Doc. 11-3, pp. 42).  Mr. Weems testified that he had been disabled since October 1, 2018, and he had not worked since.  (Doc. 11-3, p. 42).

In the fifteen years preceding his hearing, Mr. Weems had worked at a fiber mill and Bluegrass Supply company.  (Doc. 11-3, p. 43).  Mr. Weems testified that several things affected his ability to work.  (Doc 11-3, p. 44).  He indicated that he was categorized as obese due to his weight and height, and he testified that he had degenerative joint disease in both knees, a total knee replacement in his left knee

because of his degenerative joint disease, high blood pressure, high cholesterol, gastroesophageal reflux disease, hyperthyroidism, and sleep apnea. (Doc 11-3, pp. 44-45). Mr. Weems testified that, because of his total knee replacement in his left knee, he had to put more pressure on his right knee, causing his right to be more painful than his left. (Doc 11-3, p. 45). Mr. Weems explained that his total knee replacement, the physical therapy, and the revision surgery had not helped his left knee. (Doc 11-3, p. 46). Mr. Weems testified that each time he bent his knee, it popped, rattled, and caused him to be in excruciating pain. (Doc 11-3, p. 46). Mr. Weems testified that the cartilage in his right knee had deteriorated, and the bones were rubbing together. (Doc 11-3, p. 47). Mr. Weems used a cane and kept a walker nearby. (Doc 11-3, p. 47).

Mr. Weems testified that he slept approximately three hours per night because of pain. (Doc 11-3, p. 48). He testified that he could stand or walk only three or four steps before the pain would become unbearable, and he would have to sit down. (Doc 11-3, p. 48). Mr. Weems testified that his pain affected his ability to concentrate. (Doc 11-3, pp. 48, 49). Mr. Weems did not believe he could have a job where he sat down because the pain would make it hard for him to concentrate. (Doc 11-3, p. 49).

Ms. Cornett, a vocational expert, testified that Mr. Weems's previous job at the fiber mill as a doffer required medium exertion; his job at Bluegrass Supply was

16

a composite job of a material handler and an industrial truck operator, requiring semi-skills and medium exertion. (Doc 11-3, p. 52). The ALJ asked the VE to assume a hypothetical person with the same age, education, and past work experience as Mr. Weems with the following limitations:

> the person's capable of light work as defined in the regulations. The person can occasionally climb ramps and stairs, cannot climb ladders, ropes and scaffolds. The person can occasionally kneel, crouch, and crawl. The person cannot be exposed to excessive vibration, and cannot be exposed to workplace hazards such as moving mechanical parts, and high exposed places.

(Doc. 11-3, p. 53). Ms. Cornett testified that with those limitations, Mr. Weems's past work would be eliminated. (Doc 11-3, p. 53). Ms. Cornett testified that the person could perform the jobs of silver wrapper, marker, and paper sorter. (Doc 11-3, pp. 53-54). Ms. Cornett testified that if pain would cause the person to miss work four days per month and to be off task more than twenty percent of the workday, that person would be precluded from all employment at all exertional levels. (Doc 11-3, p. 54).

## THE ALJ'S DECISION

Following the hearing, the ALJ issued an unfavorable decision. (Doc. 11-3, p. 30). The ALJ found that Mr. Weems had not engaged in substantial gainful activity since October 1, 2018, the alleged onset date. (Doc. 11-3, p. 21). The ALJ determined that Mr. Weems was suffering from the severe impairments of obesity

and degenerative joint disease.  (Doc. 11-3, p. 21).  The ALJ also determined that

Mr. Weems suffered from the non-severe impairments of essential hypertension,

hyperlipidemia, gastroesophageal reflux disease, hyperthyroidism, sleep-related

breathing disorders, tobacco abuse, and cervical degenerative changes with

associated stenosis and foraminal narrowing.  (Doc. 11-3, p. 22).  Based on a review

of the medical evidence, the ALJ concluded that Mr. Weems did not have an

impairment or a combination of impairments that met or medically equaled the

severity of the listed impairments in 20 C.F.R. Part 404, Subpart P Appendix 1.

(Doc. 11-3, p. 22).

Considering Mr. Weems's impairments, the ALJ evaluated Mr. Weems's

residual functional capacity.  The ALJ determined that Mr. Weems had the RFC to

perform:

> light work . . . except he can occasionally climb ramps or stairs. He
> should never climb ladders, ropes, or scaffolds. He can occasionally
> kneel, crouch, or crawl. He should have no exposure to excessive
> vibration. He should never be exposed to workplace hazards such as
> moving mechanical parts and high, exposed place[s].

(Doc. 11-3, p. 23).  "Light work involves lifting no more than 20 pounds at a time

with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though

the weight lifted may be very little, a job is in this category when it requires a good

deal of walking or standing, or when it involves sitting most of the time with some

pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).  "If someone

can do light work . . . he can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b). "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

Based on this RFC, the ALJ concluded that Mr. Weems could not perform his past relevant work as a doffer, material handler, or industrial-truck operator. (Doc. 11-3, p. 28). Relying on testimony from the VE, the ALJ found that jobs existed in the national economy that Mr. Weems could perform, including silver wrapper (DOT 318.687-018), marker (DOT 209.587-034), and paper sorter and counter (DOT 649.687-010). (Doc. 11-3, p. 29). Accordingly, the ALJ determined that Mr. Weems was not under a disability as defined by the Social Security Act. (Doc. 11-3, p. 30).

## STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s]    the ALJ's' factual    findings    with    deference 'and    [his]

'legal conclusions with close scrutiny.'" *Riggs v. Comm r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel*, 631 F.3d at 1178 (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. If the district court finds an error in the ALJ's application of the law, or if the district court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the district court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

Mr. Weems contends that the ALJ did not properly apply the Eleventh Circuit pain standard. Mr. Weems also argues that the ALJ's decision to discredit Mr. Weems's subjective complaints is not supported by the medical evidence in the administrative record.

The Eleventh Circuit pain standard "applies when a disability claimant attempts to establish disability through his own testimony of pain or other subjective symptoms." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Coley v. Comm'r, Soc. Sec. Admin.*, 771 Fed. Appx. 913, 917. (11th Cir. 2019). When relying upon subjective symptoms to establish disability, "the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged [symptoms]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [symptoms]." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt*, 921 F.2d at 1223); *Chatham v. Comm'r, Soc. Sec. Admin.*, 764 Fed. Appx. 864, 868 (11th Cir. 2019) (citing *Wilson*). If the ALJ does not properly apply the three-part standard, reversal is appropriate. *McLain v. Comm'r, Soc. Sec. Admin.*, 676 Fed. Appx. 935, 937 (11th Cir. 2017) (citing *Holt*).

A claimant's credible testimony coupled with medical evidence of an impairing condition "is itself sufficient to support a finding of disability." *Holt*, 921

F.2d at 1223; *see Gombash v. Comm'r, Soc. Sec. Admin.*, 566 Fed. Appx. 857, 859

(11th Cir. 2014) ("A claimant may establish that he has a disability 'through his own

testimony of pain or other subjective symptoms.'") (quoting *Dyer v. Barnhart*, 395

F.3d 1206, 1210 (11th Cir. 2005)).    If an ALJ rejects a claimant's subjective

testimony, the ALJ "must articulate explicit and adequate reasons for doing so."

*Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).   The Secretary must

accept the claimant's testimony, as a matter of law, if the ALJ inadequately discredits

the testimony.  *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988); *Kalishek v.*

*Comm'r, Soc. Sec. Admin.*, 470 Fed. Appx. 868, 871 (11th Cir. 2012) (citing

*Cannon*).

    When credibility is at issue, the provisions of Social Security Regulation 16-

3p apply.  SSR 16-3p provides:

> [W]e recognize that some individuals may experience symptoms
> differently and may be limited by symptoms to a greater or lesser extent
> than other individuals with the same medical impairments, the same
> objective medical evidence, and the same non-medical evidence. In
> considering the intensity, persistence, and limiting effects of an
> individual's symptoms, we examine the entire case record, including
> the objective medical evidence; an individual's statements about the
> intensity, persistence, and limiting effects of symptoms; statements and
> other information provided by medical sources and other persons; and
> any other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4.   Concerning the ALJ's burden when

discrediting a claimant's subjective symptoms, SSR 16-3p provides:

> [I]t is not sufficient . . . to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent." It is also not enough . . . simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2016 WL 1119029, at *10.

> In evaluating a claimant's reported symptoms, an ALJ must consider:
>
> (i)   [the claimant's] daily activities;
>
> (ii)  [t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;
>
> (iii) [p]recipitating and aggravating factors;
>
> (iv)  [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;
>
> (v)   [t]reatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;
>
> (vi)  [a]ny measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Leiter v. Comm'r of SSA*, 377 Fed.

Appx. 944, 947 (11th Cir. 2010).

Here, Mr. Weems suffers from the severe impairments of obesity and degenerative joint disease.  In the "Adult Function Report" which Mr. Weems completed on August 8, 2019, Mr. Weems indicated that "his impairments affect his ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs, and complet[e] tasks." (Doc. 11-7, pp. 33, 34).  Mr. Weems stated that he needed help bathing, using the toilet, and putting on his socks and shoes.  (Doc. 11-7, p. 29).  Mr. Weems reported that he did not prepare meals because he could not stand, and he did not help with household chores for the same reason.  (Doc. 11-7, pp. 31-32).  Mr. Weems indicated that he could drive, but he did not leave his house, and he needed someone with him when he did leave.  (Doc. 11-7, pp. 31-33).  Mr. Weems indicated that he had no difficulty paying attention or following instructions.  (Doc. 11-7, p. 33).  Just over one year later at his administrative hearing, Mr. Weems testified that his pain affected his ability to concentrate.  (Doc 11-3, pp. 48, 49).

The ALJ discounted Mr. Weems's description of his pain and physical limitations based on a selective reading of Mr. Weems's medical records.  The ALJ noted Mr. Weems's total left knee arthroplasty went well.  (Doc. 11-3, pp. 24-25).  The ALJ acknowledged that Mr. Weems had to undergo revision surgery in January 2019, but he focused on a February 2019 record that indicated that Mr. Weems was improving somewhat.  (Doc. 11-3, p. 25).  The ALJ acknowledged briefly that Mr. Weems's treating orthopedist, Dr. Cobb, had instructed him not to return to work in

February 2019 and that Mr. Weems reported to Dr. Cobb at his next appointment in April 2019 that he had lost his job. (Doc. 11-3, p. 25). The ALJ also acknowledged that at the April 2019 appointment, Dr. Cobb indicated that Mr. Weems was walking with a cane, and the orthopedist gave him a prescription for pain and a handicap placard for his car. (Doc. 11-3, p. 25). The ALJ omitted from his discussion of Dr. Cobb's records that Mr. Weems initially returned to work after his first surgery, but Dr. Cobb instructed him to stop working and maintained that instruction throughout his treatment of Mr. Weems. (Doc. 11-8, pp. 150, 165, 166, 172). The weight of this evidence supports Mr. Weems's reports about his pain and limitations.

The ALJ pointed out that Mr. Weems did not see a doctor between August 2019 and March 2020, but the ALJ did not mention that Mr. Weems was unemployed and did not have insurance. (Doc. 11-3, p. 25; Doc. 11-9, p. 33). Mr. Weems paid for his March 2020 appointment with cash and received a discount. (Doc. 11-9, p. 17; *see also* Doc. 11-9, p. 15 (cash payment for April 2020 visit)). The ALJ acknowledged that at the March 2020 appointment, Mr. Weems had a click in his left knee with movement, and he was experiencing right knee pain because of his abnormal gait; the ALJ noted that Mr. Weems was not taking anything for his pain. (Doc. 11-3, p. 25). The ALJ did not mention that Mr. Weems was walking with a cane. (Doc. 11-9, p. 20). The ALJ highlighted the fact that at the March 2020 appointment, Dr. Walker noted no swelling and normal motor strength. (Doc. 11-3,

p. 25; *see* Doc. 11-9, p. 20).  The ALJ correctly noted that Mr. Weems's 2020 medical records, in the "Social History" section, indicate that Mr. Weems did not report difficulty bathing, walking, or climbing stairs, (Doc. 11-3, p. 26; Doc. 11-9, pp. 16, 19), but the ALJ omitted the fact that Mr. Weems's social history was reviewed only at his March 2020 appointment, (Doc. 11-9, p. 16), that Mr. Weems was walking with a cane at his March 2020 appointment, (Doc. 11-9, p. 20), and that at his April 2020 appointment, Dr. Hodge recommended that he "reach[] out to the Orthopedic Surgeon who performed surgery for further evaluation of knee pain," (Doc. 11-9, p. 17).

The ALJ relied on Dr. Sellman's opinion that Mr. Weems could perform work at the light exertional level because of her "specialty and program knowledge," and the ALJ asserted that Dr. Sellman's opinion was "generally consistent with the medical evidence in the record."  (Doc. 11-3, p. 27).  As noted above, that one-time administrative assessment was conducted on August 28, 2019.  The ALJ discounted Dr. Moore's significant limitations in Mr. Weems's physical capacities report because Mr. Weems had only two visits with Dr. Moore and because Dr. Moore did not develop a treatment plan for Mr. Weems, (Doc. 11-3, p. 27), but the ALJ omitted Dr. Moore's comment that Mr. Weems was reluctant to pursue additional treatment because he did not have insurance.  (Doc. 11-9, p. 33).

An ALJ cannot cherry-pick evidence in an applicant's medical records to support a conclusion. *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986*)* ("It is not enough to discover a piece of evidence which supports [a] decision, but to disregard other contrary evidence[,]" and a decision is not supported where it was reached "by focusing upon one aspect of the evidence and ignoring other parts of the record"); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").

In addition, an ALJ must consider a claimant's ability to afford treatment. When a claimant cannot afford prescribed treatment, he is excused from noncompliance. *See Dawkins v. Bowen*, 848 F.2d 1211, 1213-14 (11th Cir. 1988*).* The burden of proving unjustified noncompliance is on the Commissioner. *See Dawkins*, 848 F.2d at 1213; *see also Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003).

Finally, the Court notes that two of Mr. Weems's medical visits in 2020 were telehealth visits. For one, Mr. Weems could not access the visit by video, so he had to send a picture of a rash that he was experiencing. (Doc. 11-9, p. 28). During these telehealth visits, doctors could not assess Mr. Weems's strength or fully examine his range of motion. In addition, after Mr. Weems lost his insurance and

stopped seeing Dr. Cobb, he visited only one orthopedist, Dr. Moore.  When Mr. Weems saw Dr. Moore, he (Mr. Weems) was experiencing pain in his left and right knees, but he did not seek treatment because he could not afford it.  Therefore, Mr. Weems has no treatment records for his right knee pain, and his last treatment record for left knee pain is his record of his April 2019 visit with Dr. Cobb.

"[Administrative] proceedings are inquisitorial rather than adversarial.  It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits . . . ."  *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000) (citing *Richardson v. Perales*, 402 U.S. 389, 400–01 (1971)).  When processing disability claims, ALJs "do not simply act as umpires calling balls and strikes.  They are by law investigators of the facts, and are tasked not only with the obligation to consider the reasons offered by both sides, but also with actively developing the record in the case."  *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1356 (11th Cir. 2018).  To be sure, "claimants must establish that they are eligible for benefits," but an ALJ "has a duty to develop the record where appropriate . . . ."  *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1269 (11th Cir. 2007) (citing *Doughty v. Apfel*, 245 F.3d 1274, 1281 (11th Cir. 2001)).  Because of Mr. Weems's inability to afford treatment, the ALJ, at a minimum, should have ordered an updated orthopedic assessment of Mr. Weems's left and right knees before rendering a decision.

For these reasons, the Court concludes that substantial evidence does not support the ALJ's decision.

## CONCLUSION

For the reasons discussed above, the Court remands this case for further proceedings consistent with this opinion.

**DONE** and **ORDERED** this August 3, 2022.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE